RALPH J. MATTO, EXECUTOR (ESTATE OF BETTY J. MATTO) *v.* DAN BEARD, INC.
(5350)

SPALLONE, BIELUCH and STOUGHTON, Js.

Argued December 17, 1987—decision released August 16, 1988

*Lorraine W. Osborne,* with whom was *Daniel Shepro,* for the appellant (plaintiff).

*Edward Maum Sheehy,* for the appellees (defendants).

BIELUCH, J. The plaintiff[1] has appealed from the trial court's judgment denying his claims for injunctive relief, for a declaratory judgment and for damages, and from the judgment on the counterclaim finding that the named defendant has adversely possessed a portion of the plaintiff's riparian rights in the Housatonic River. The plaintiff claims that the trial court erred (1) in holding that the defendants established adverse possession of the disputed land, (2) in holding that the plaintiff's action was barred by General Statutes § 52-575, (3) in leaving title to portions of the subject property unresolved, and (4) in concluding that the state is a necessary party to the action. The defendants have presented these alternate grounds for affirming the judgment: (1) "The claims of the plaintiff are barred by the [three-year] statute of limitations set forth in § 52-577"; and (2) "The plaintiff failed in his burden of proof to establish his right to damages and to an injunction." We find error.

On July 25, 1983, the plaintiff's decedent, Betty J. Matto, brought this action against the defendant Dan

---

[1] The plaintiff, in addition to his representative capacity, is a party to the action individually as devisee of the decedent's estate.

Beard, Inc., in three counts, seeking to enjoin it from dredging fill and gravel from her property, from trespassing thereon, and from removing boundary markers. In addition, she sought a declaratory judgment as to the ownership of the land abutting the original easterly portion of her property, and monetary damages. Betty J. Matto died on August 9, 1983, and her husband, Ralph J. Matto, executor of her estate, was substituted as plaintiff on August 13, 1984.

Before trial began on November 4, 1985, the court granted the motion of Daniel Nichols Beard that he be named a party defendant and that the plaintiff amend the complaint to show Beard's alleged interest in the disputed property abutting the original easterly boundary of the plaintiff's land. In this motion, Beard alleged (1) that he was the president and the principal and controlling shareholder of the named defendant Dan Beard, Inc., (2) that "he [was] the owner of the property abutting the plaintiff's land referred to in the plaintiff's complaint and claims the same by adverse possession," and (3) that he had an interest in the controversy adverse to the plaintiff or was a necessary party for a complete determination of the questions involved in the action. The court also granted the motion of Ralph J. Matto to become an additional party plaintiff as the sole devisee of the real estate owned by his deceased wife, Betty J. Matto, the original plaintiff. The pleadings were amended to reflect the court's orders.

In the first count of the plaintiff's amended complaint, the following allegations were made. Betty J. Matto acquired a certain parcel of land on the easterly side of River Road in Shelton, bounded on the east by the Housatonic River, 130 feet, more or less, by warranty deed of Building Coordinators, Inc., executed on its behalf by the plaintiff, Ralph J. Matto, its president, on April 2, 1980. Prior to this acquisition of the property, and continuing to the present, the corporate

defendant has maintained a dredging operation in the Housatonic River. Because of these dredging operations, the plaintiff's property bounded on the Housatonic River has been eroded, undermined and washed away; gravel and fill have been taken, and continue to be taken, from the property; he is unable to utilize and develop the property; and land which was formerly under water and adjacent to the property is now located at or above sea level. As a result, the plaintiff has lost the reasonable use of riparian property adjacent to navigable waters and his right, as riparian owner, of reasonable access to the Housatonic River. The defendant Dan Beard, Inc., has refused the requests of the plaintiff that it cease and desist from its dredging operations and that it remove its machinery and equipment from the land which now abuts the easterly portion of his property, some or all of which land the individual defendant Daniel Nichols Beard now claims by adverse possession.

The second count alleged that as a result of these dredging activities, land formerly under water was now at or near sea level and should belong to the plaintiff together with riparian rights. In the third count, the plaintiff alleges that the corporate defendant had caused the removal of boundary stakes which had been set after a survey of his property.

The *defendant*[2] filed an answer denying the plaintiff's allegations and pleading three special defenses. The first and second special defenses alleged that the plaintiff's claims were barred by the statute of limitations and by laches. The third special defense alleged that,

---

[2] Both in the pleadings and in the memorandum of decision, the parties and the court have, in many instances, used the singular "defendant" as opposed to the plural "defendants" or to the specific defendant, corporate or individual, intended. In order to minimize any confusion caused by such imprecise pleadings and references, we have used italics to indicate those instances.

by virtue of the adverse user and possession of the premises by "the *defendant* and *his* predecessor in title" for more than fifteen years prior to the commencement of this action, "the *defendant* and *his* predecessor have thereby acquired and the *defendant* now has sole and exclusive title to the premises as well as the corresponding riparian rights therein." (Emphasis added.) In a counterclaim, it was alleged that "by reason of adverse possession on *its* part and the part of *its* predecessor in title" for more than fifteen years prior to the commencement of this action, "the *defendant* now has sole and exclusive title to the premises and corresponding riparian rights therein." In this counterclaim, the *defendant* sought a decree that "*it* has acquired title to said premises." (Emphasis added.)

After a two day trial, the court issued a lengthy memorandum of decision. The following facts were found. On October 31, 1979, the plaintiff's corporation, Building Coordinators, Inc., acquired by warranty deeds of Alice R. Bardugone and Louis J. Francini two contiguous parcels of land, the first of which is the property described in the plaintiff's complaint. They were conveyed by warranty deed to the plaintiff's decedent on April 2, 1980. When the premises were later surveyed in July 1980, the plaintiff learned that the easterly boundary was entirely on land, and not at the river's edge, and that the operations and machinery of the defendant Dan Beard, Inc., were on a portion of his land. The surveyor's stakes marking the easterly boundary had been run over by the corporate defendant's trucks and subsequently disappeared.

The plaintiff took immediate action to protect the decedent's rights, first by sending a letter on July 1, 1980, to the *defendant Beard* notifying the defendants of the claims and demanding that they cease operations on the property, and later by speaking to him. Failing in these attempts, the decedent's attorney, on June 16,

1981, formalized these demands by certified letter to the *defendant Beard.* When these oral and written demands were not met, the attorney sent a final letter on October 15, 1981, again without result. This suit followed on July 25, 1983.

The trial court further found: "[T]he plaintiff's property's easterly boundary fronted on the Housatonic River in 1965, except for forty feet of roadway northerly of the *Beard* property's northerly boundary and that roadway being on land below the high-water mark of the Housatonic River. The forty feet had been built by *Beard* dredging the river and placing the fill in the river to the east of the plaintiff's easterly boundary." (Emphasis added.) It was not "a roadway in the ordinary sense—its use was limited to passage by *Beard's* equipment only, and for the location of *Beard's* machinery used for dredging from time to time." (Emphasis added.) In 1970, the roadway extended the full length of 130 feet of the Matto property's easterly boundary and "extended easterly from the plaintiff's easterly boundary into the river and was below the high-water mark . . . to Two Mile Island, an island located in the Housatonic River and owned by the *defendants.*" (Emphasis added.) The court further found that "[T]he Housatonic River is a tidal river and, therefore, has high and low-water marks."

Additionally, the court found: "In 1975 the roadway continued to exist along the full length of the plaintiff's easterly boundary, as did the causeway extending easterly to Two Mile Island. In 1975 on the island causeway were two land locked sump ponds, the second one having been created in 1972 by the defendant company and, as a result of both the roadway and causeway described, the plaintiff's land no longer fronted on the river. In 1980, the same situation continued to exist as in 1975 and 1970 . . . . *Beard* . . . built the roadway along the easterly boundary of the plaintiff's prop-

erty and on the river in the course of *his* dredging operations. The causeway, from the plaintiff's easterly boundary to Two Mile Island, was commenced in 1974 and finished in 1975. The *defendant's* derrick was located on the roadway easterly of the premises in 1975 and 1980, but not in 1970. Daniel Beard owns personally the adjoining land southerly of the Matto premises and the Company owns Two Mile Island. Since 1946, *Beard* has stockpiled gravel on the Matto property temporarily and moved equipment across that property 'off and on.' " (Emphasis added.)

The court also found that "the *defendant's* dredging operations have eroded and undermined a portion of the plaintiff's premises at the southeasterly corner, however, the exact dimensions of that portion have not been delineated for the court. The *defendant* has removed from that portion of the premises an undetermined amount of gravel and fill." (Emphasis added.) There was no evidence "to show when the fill and gravel was removed so that the court is unable to determine a starting point for the period of adverse possession. The court finds that the *defendant's* operation has filled the land immediately abutting the plaintiff's easterly boundary and below the high-water mark, from time to time, and to such an extent that the plaintiff no longer has access from his premises to the Housatonic River, the plaintiff is unable to utilize his property as he had anticipated and his riparian rights have been affected. The *defendant* continues to use the filled land and prevents the plaintiff from exercising his riparian rights." (Emphasis added.)

Additionally, the court found "that the so-called roadway to the east of the plaintiff's easterly boundary and below the high-water mark existed for a distance of forty feet northerly from the plaintiff's southeasterly corner . . . in 1965. The remaining ninety feet of the easterly boundary had access to the river . . . . [It

was] not until 1970 [that] the so-called roadway [was] completed along the entire easterly boundary and that thereafter the area to the east of the easterly boundary of the so-called roadway, and located in the river, was filled by the *defendant* to create sump ponds, a causeway to Two Mile Island and on which the *defendant* placed some of its machinery from time to time, but not continuously . . . . [T]he *defendant's* trucks have crossed the southeasterly portion of the plaintiff's premises from 1973 to date in order to convey material to and from its machinery located on the land created by filling the river land." (Emphasis added.)

The final finding of fact was that in 1980 Matto made known to *Beard* that *Beard* was encroaching on the decedent's property, violating her rights. Matto became aware of this by having the easterly boundary line staked out. Thereafter, he discussed the matter with *Beard,* wrote to *Beard* on July 1, 1980, and subsequently sent two letters to *Beard* through his attorney.

On the basis of its findings, the trial court made the following conclusions of law: The special defense "that *it* has acquired the land by virtue of adverse possession" (emphasis added) is a question of fact and must be established by clear and positive proof. Further, that the land in issue, located easterly of the plaintiff's easterly boundary, extends from the high-water mark into the river, and that the land below the high-water mark is owned by the state, citing *Hotchkiss Grove Assn., Inc.* v. *Water Resources Commission,* 161 Conn. 50, 54, 282 A.2d 890 (1971). Finally, that "[t]he land filled by the *defendant* below the high-water mark and easterly of the plaintiff's easterly boundary line belongs to the state of Connecticut, however, the plaintiff upland owner has certain exclusive yet qualified rights therein. . . . [O]ne may not acquire rights by way of adverse possession to land owned by the state . . . . Neither the plaintiff nor the *defendant* can claim title

to this parcel of land in the river to the east [of] the plaintiff's easterly boundary. However, riparian rights of an upland owner may be acquired by adverse possession. *Dimmock* v. *New London,* 157 Conn. 9, 15 [245 A.2d 569 (1968)]; *S. O. & C. Co.* v. *Ansonia Water Co.,* 83 Conn. 611, 624 [78 A. 432 (1910)]." (Emphasis added.)

The court, therefore, ruled as follows: "The *defendant* acquired the riparian rights of the plaintiff to the portion of the roadway below the high-water mark for a distance of forty feet from the plaintiff's southerly boundary, since *it* filled the land before 1965 and used it continuously, openly, notoriously, exclusively, adversely to the plaintiff's and his predecessor's in title's rights and under a claim of right for an uninterrupted period of fifteen years. The filling of the land and the continuous maintenance of the fill on the land was sufficient by itself to fulfill the requirements of adverse possession; it constituted a using of the land. In addition thereto, the use for dredging the river was open, notorious, exclusive, adverse to the owner's rights, made under a claim of right, and uninterrupted for a period of fifteen years . . . from 1965 to July, 1980. However, the filling of the remaining filled portion, below the high-water mark, on the plaintiff's easterly boundary for a distance of ninety feet . . . did not occur until 1970 . . . so that the use was not for a continuous period of fifteen years" (emphasis added) before the plaintiff exerted his rights in 1980 and 1981.

With respect to the southeasterly portion of the plaintiff's premises "to which the defendants claim title by adverse possession, the court [found] that they [had] not demonstrated by clear and positive evidence continuous use for an uninterrupted period of fifteen years."

As to the special defense of the statute of limitations contained in General Statutes § 52-575,[3] the court found for the defendants. The statute requires that a person, not in possession of realty which another is holding adversely, reenter the land within fifteen years of being disseized and assert title, and to commence an action within one year of his entry in order for that reentry to be effective to interrupt the running of the statutory period. The court found that the plaintiff and his decedent had made four entries upon the premises. The first was made by their surveying and staking of the boundaries and by Matto's discussion with Beard relative to their claims. Matto's letter of July 1, 1980, and those of his counsel on June 16 and October 15, 1981, constituted additional entries. The plaintiff did not, however, commence action within one year after any of these entries. Suit was instituted on July 25, 1983, against the corporate defendant, and Beard, himself, was not made a defendant until November 4, 1985. As a result, the plaintiff's claims of title were denied by the court for failure to exercise his rights under § 52-575. It also ruled, on that basis, that the plaintiff was not entitled to an injunction, or to damages for the cost of removing the fill in the river easterly of the eastern boundary.

The court responded to the plaintiff's claim that no rights of the corporate defendant came into existence until 1973, when it was incorporated, as follows: "While it is true that the Company existed only since 1973, *Beard and his brothers and their various corporations*

[3] General Statutes § 52-575 provides in pertinent part: "No person shall make entry into any lands or tenements but within fifteen years next after his right or title to the same first descends or accrues; and every person, not entering as aforesaid, and his heirs, shall be utterly disabled to make such entry afterwards; and no such entry shall be sufficient, unless an action is commenced thereupon and prosecuted to effect within one year next after such entry."

*have been conducting the dredging operation continuously since the 1930's and therefore there has been the required continuity of time of the dredging and fill operations to complete the process known as tacking."* (Emphasis added.)

In recapitulation of its holdings, the court ruled as follows: (1) "[J]udgment may enter for the *defendant* on all of the counts of the plaintiff's complaint by reason of the plaintiff's failure to institute suit within one year of his reentry upon the property [pursuant to General Statutes] § 52-575" (emphasis added); (2) "[t]he *defendant,* in its counterclaim, has proved only that it has adversely possessed the plaintiff's riparian rights easterly of the plaintiff's easterly boundary for a distance of forty feet northerly measured from the southeasterly corner of the plaintiff's premises as shown on the map attached"; (3) "[t]he *defendant's* claims to the remaining portion of the plaintiff's riparian rights and the southeasterly corner of the plaintiff's premises are denied for the failure to comply with the fifteen year requirement of continuous possession"; and (4) "[t]he plaintiff's claim for a declaratory judgment is denied for failure to include all affected parties, particularly the State of Connecticut, the owner of the land, over which riparian rights are claimed."

The trial court refused to consider the special defense of the three year statute of limitations for torts provided in General Statutes § 52-577,[4] holding that "[o]nce the fifteen year period is complete, the plaintiff no longer has any rights to be enforced and the three year statute is unavailing." The court also ruled that the defense of laches was inapplicable, "since the plaintiff acted promptly to claim his rights after they

[4] General Statutes § 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

became known to him and the defendant based none of its actions on the plaintiff's inaction."

It is necessary for our consideration of the plaintiff's appeal that we review additional facts established by the record, but not discussed by the trial court in its memorandum of decision. The defendant Daniel Nichols Beard, and not the defendant Dan Beard, Inc., is the owner of Two Mile Island. He acquired this island by warranty deed of Royal P. Wright and Ralph O. Wright, dated February 20, 1941. When he purchased the property, it was a true "island" separated from the west shore of the Housatonic River and the property now owned by the plaintiff. It was, however, then accessible at low tide by foot.

On July 16, 1946, Daniel Beard received the following permit from the War Department: "[U]pon the recommendation of the Chief of Engineers, and under the provisions of Section 10 of the Act of Congress approved March 3, 1899, entitled 'An act making appropriations for the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes,'[5] you are hereby authorized by the Secretary of War, to construct two bulkheads of grounded barges filled with gravel in Housatonic River at Shelton, Connecticut, just below the north end of Two Mile Island and on the west shore of the river just below Wright Street in accordance with the plans shown on the drawing attached hereto marked: 'Proposed Bulkheads in Housatonic River Adjacent to Two

---

[5] The Rivers and Harbors Appropriation Act of March 3, 1899, c. 425, § 10, 30 Stat. 1151, 33 U.S.C. § 403, provides in relevant part: "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any . . . bulkhead . . . in any . . . navigable river . . . unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army [formerly Secretary of War] . . . ."

Mile Island and West Shore of River' subject to the following conditions." This document, introduced as an exhibit by the defendants, consists of a single sheet. The attachments of plans and conditions referred to therein were not submitted in evidence.

The following headnote appears on this permit: "NOTE.—It is to be understood that this instrument does not give any property rights either in real estate or material, or any exclusive privileges; and that *it does not authorize any injury to private property or invasion of private rights,* or any infringement of Federal, State or local laws or regulations, nor does it obviate the necessity of obtaining State assent to work authorized. IT MERELY EXPRESSES THE ASSENT OF THE FEDERAL GOVERNMENT SO FAR AS CONCERNS THE PUBLIC RIGHTS OF NAVIGATION. (See *Cummings* v. *Chicago,* 188 U.S. 410.)" (Emphasis added.)

On September 20, 1973, Douglas M. Costle, commissioner of environmental protection, brought an action against The Dan Beard Construction Co., Inc., *Douglas M. Costle, Commissioner of Environmental Protection* v. *The Dan Beard Construction Co., Inc.,* Superior Court, Fairfield County, Docket No. 150906; under General Statutes (Rev. to 1972) § 25-11,[6] seeking tem-

---

[6] General Statutes (Rev. to 1972) § 25-10 provided in relevant part: "The commissioner of environmental protection shall regulate the taking and removal of sand, gravel and other materials from lands under tidal and coastal waters with due regard for . . . the rights of riparian property owners . . . and the improvement, protection or development of uplands bordering upon tidal and coastal waters, with due regard for the rights and interests of all persons concerned."

General Statutes (Revised to 1972) § 25-11 provided in relevant part: "[N]o person, firm or corporation, public or private, shall remove sand, gravel or other material lying below the mean high water mark of the tidal and coastal waters of the state unless such person, firm or corporation first obtains a permit from the commissioner and agrees to comply with the conditions prescribed in such permit, including a certification by the commissioner that payment for such sand, gravel and other materials shall be paid

porary and permanent injunctions ordering the defendant in that case to cease dredging operations in the Housatonic River, and to restrain it from selling or otherwise disposing of illegally removed sand, gravel and other material found at the site. On November 5, 1973, a second suit; *Douglas M. Costle, Commissioner of Environmental Protection* v. *The Dan Beard Construction Co., Inc.*, Superior Court, Fairfield County, Docket No. 151455; was instituted under General Statutes (Rev. to 1972) §§ 25-7d and 25-7e[7] seeking temporary and permanent injunctions ordering the removal and dismantling of two illegal earthen and gravel causeways connecting Two Mile Island with the Shelton mainland and installed without appropriate permits as required by law.

Both cases were consolidated for trial. Daniel Nichols Beard, as the owner of Two Mile Island, and Dan Beard, Inc., as the successor operator of the dredging activities at Two Mile Island, were cited as additional defendants in these actions on April 23, 1974, when a joint stipulation was entered into between the parties for settlement of the actions. With the approval of the

---

to the state, the amount of any such payment and the time or times of payment, when such materials are disposed of for commercial purposes."

[7] General Statutes (Rev. to 1972) § 25-7d provided in relevant part: "No person, firm or corporation, public, municipal or private, shall erect any structure, place any obstruction or encroachment or carry out any dredging or other work incidental thereto in the tidal, coastal or navigable waters of the state until such person, firm or corporation has submitted an application and has secured from said commissioner a certificate or permit for such work and has agreed to carry out any conditions necessary to the implementation of such certificate or permit."

General Statutes (Rev. to 1972) § 25-7e provided: "Any structure, obstruction or encroachment placed in the tidal, coastal or navigable waters of the state or any activity carried out incidental to the construction or maintenance of such structures or encroachments without a certificate or permit from the commissioner shall be considered a public nuisance. The attorney general shall, at the request of the commissioner, institute proceedings to enjoin or abate any such nuisance."

court, it was agreed that Daniel Nichols Beard would file an application with the commissioner of environmental protection for the necessary permit and approval for the two existing causeways or roadways connecting Two Mile Island with the Shelton mainland. Pending such approval, the litigation would be stayed. After the filing of the stipulation, a mistrial was declared in each case.

On July 11, 1974, the defendant Daniel Nichols Beard applied to the department of environmental protection for a permit to approve the existence and maintenance of the two existing causeways from Two Mile Island to the west bank of the Housatonic River. As part of this application, the "NAMES AND MAILING ADDRESSES OF ALL ADJOINING PROPERTY OWNERS WHOSE PROPERTY ALSO ADJOINS THE WATERWAY" listed by Beard were those of Ralph Hopkins and Riverview Cemetery. The name and address of the then owner of the plaintiff's property was not furnished as such an adjoining owner, even though a review of the attached plan discloses that the property of the plaintiff's predecessor, shown as being owned by "N/F A. Bardugone," adjoined the southerly portion of the northernmost of the two existing causeways and the "Lagoon" created between the two causeways. On October 17, 1974, a permit was approved by the department of environmental protection for "retaining and maintaining a 100 ft. by 250 ft. causeway which is located in the approximate center of the island; a 100 ft. by 225 ft. causeway which is located on the northern end of the island. . . . The causeways are located adjacent to Two Mile Island and the west bank of the Housatonic River in Shelton and *are primarily used as access to the Island.*" (Emphasis added.)

This permit expressly stipulated that it "is subject to and in no way derogates any present or future property or other rights or powers of the State of Connect-

icut, and *conveys no property rights in real estate or material nor any exclusive privileges, and is further subject to any and all public and private rights* and to any federal, state or local laws or regulations pertinent to the property or activity affected hereby." (Emphasis added.)

General and special conditions were attached. Of these, the following is relevant: "3. That no attempt shall be made by the permittee or the owner to forbid the full and free use by the public of all tidal or navigable waters at or adjacent to the work or structure; that there shall be no unreasonable interference with navigation by the work herein authorized."

## I

The first and principal claim of the plaintiff is that the trial court erred in holding that "[t]he *defendant,* in its counterclaim, has proved only that it has adversely possessed the plaintiff's riparian rights, easterly of the plaintiff's easterly boundary for a distance of forty feet northerly measured from the southeasterly corner of the plaintiff's premises as shown on the map attached." (Emphasis added.) We agree.

The third special defense and counterclaim of the individual and corporate defendants, respectively, alleged adverse user and possession of the premises described and referred to in the plaintiff's complaint and now claimed *"sole and exclusive title to the premises as well as the corresponding riparian rights therein."* (Emphasis added.) The third special defense alleged: "The *defendant* and *his* predecessor in title have used and enjoyed the premises described in the complaint for more than fifteen (15) years prior to the commencement of this action and such use and possession has at all times been open, visible, notorious, adverse, exclusive, continuous, uninterrupted and under a claim of

right and the *defendant* and *his* predecessor have thereby acquired and the *defendant* now has sole and exclusive *title* to the premises as well as the corresponding riparian rights therein." (Emphasis added.) That was the claim of the defendant Daniel Nichols Beard.

The counterclaim alleged: "The *defendant* is the *owner of the land referred to in the plaintiff's complaint and has corresponding riparian rights therein by reason of adverse possession on its part and the part of its predecessor in title* which have used and enjoyed the premises described in the complaint for more than fifteen (15) years prior to the commencement of this action and such use and possession has been at all times open, visible, notorious, adverse, exclusive, continuous, uninterrupted and under a claim of right and the *defendant* now has sole and exclusive title to the *premises and corresponding riparian rights therein.*" (Emphasis added.) That was the claim of the defendant Dan Beard, Inc.

Adverse possession is a question of fact, and the conclusion of the trial court, necessarily involved in its determination of this issue, is not reviewable by this court unless it appears, as is the case here, that the subordinate facts found are legally or logically inconsistent with or are insufficient to support that conclusion. *Lengyel* v. *Peregrin,* 104 Conn. 285, 288, 132 A. 459 (1926); *Sands Associates* v. *Rios,* 6 Conn. App. 84, 86, 503 A.2d 179 (1986); *Clark* v. *Drska,* 1 Conn. App. 481, 484-85, 473 A.2d 325 (1984). The record in this case does not support the trial court's conclusion that "[t]he *defendant* [Dan Beard, Inc.], in its counterclaim, has proved only that it has adversely possessed the plaintiff's riparian rights, easterly of the plaintiff's easterly boundary for a distance of forty feet northerly measured from the southeasterly corner of the plaintiff's premises as shown on the map attached." (Emphasis added.)

The doctrine of adverse possession is to be taken strictly. *Roche* v. *Fairfield,* 186 Conn. 490, 499, 442 A.2d 911 (1982); *Huntington* v. *Whaley,* 29 Conn. 391, 398 (1860). The burden of proof is on the claimant. Adverse possession is not to be made out by inference, but by clear and positive proof. *Roche* v. *Fairfield,* supra, 498; *Woycik* v. *Woycik,* 13 Conn. App. 518, 520, 537 A.2d 541 (1988); *LaPre* v. *Nibo Films, Ltd.,* 10 Conn. App. 669, 672 n.3, 525 A.2d 140 (1987); *Clark* v. *Drska,* supra, 484. "Clear and positive" proof is equated with "clear and convincing" proof. *Clark* v. *Drska,* supra, 487. "In cases such as this which require such a showing of proof, the burden of persuasion is sustained if the evidence 'induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist.' See *Dacey* v. *Connecticut Bar Assn.,* [170 Conn. 520, 537, 368 A.2d 125 (1976)]." *Lopinto* v. *Haines,* 185 Conn. 527, 534–35, 441 A.2d 151 (1981); *Clark* v. *Drska,* supra, 487.

The essential elements of an adverse possession sufficient to create title to the land in the claimant are that the owner shall be ousted of his possession and kept out uninterruptedly for a period of fifteen years, by an open, visible and exclusive possession by the claimant without the license or consent of the owner and under a claim of right. *Ruick* v. *Twarkins,* 171 Conn. 149, 155, 367 A.2d 1380 (1976); *Wadsworth Realty Co.* v. *Sundberg,* 165 Conn. 457, 462, 338 A.2d 470 (1973); *LaPre* v. *Nibo Films, Ltd.,* supra, 671. A title to land by adverse possession is acquired under the operation of our statute of limitations; General Statutes § 52-575;[8] the owner is thereafter barred from making entry into the subject land. *LaPre* v. *Nibo Films, Ltd.,* supra.

---

[8] See footnote 3, supra.

One claiming title by adverse possession always claims in derogation of the right of the true owner, admitting that the legal title is in another. The adverse claimant rests the claim, not on title, but on holding adversely to the true owner for the term prescribed by the statute of limitations. 3 Am. Jur. 2d, Adverse Possession § 9. The use is not exclusive if the adverse user merely shares dominion over the property with other users. *Whitney* v. *Turmel,* 180 Conn. 147, 148, 429 A.2d 826 (1980); *Short Beach Cottage Owners Improvement Assn.* v. *Stratford,* 154 Conn. 194, 199, 224 A.2d 532 (1966). Title to realty held in fee by a state or any of its subdivisions for a public use cannot be acquired by adverse possession. *Goldman* v. *Quadrato,* 142 Conn. 398, 402–403, 114 A.2d 687 (1955).

The Housatonic River is a navigable and tidal river. Therefore, it has high and low-water marks. The plaintiff's property is bounded easterly 130 feet by the Housatonic River. This description is equivalent to a boundary at the high-water mark, since the land between high and low-water marks, called the foreshore, remains in the state. *Mihalczo* v. *Woodmont,* 175 Conn. 535, 538, 400 A.2d 270 (1978); *Short Beach Cottage Owners Improvement Assn.* v. *Stratford,* supra, 200. "In using the term 'high-water mark' the line of mean high-water mark or 'ordinary high-water mark is always intended.' *United States* v. *Pacheco,* 69 U.S. (2 Wall.) 587, 590, 17 L. Ed. 865 [1864]; *Freeman* v. *Bellegarde,* 108 Cal. 179, 41 P. 289 [1895]." *Mihalczo* v. *Woodmont,* supra.

The plaintiff's property no longer reaches or touches the Housatonic River. Instead, its eastern boundary of 130 feet fronts on a "roadway" built by the defendants below the high-water mark of the river and extending in width from the plaintiff's land to the new shore line created by it. The trial court found this "roadway . . . had been built by *Beard* dredging the river and

placing the fill in the river to the east of the plaintiff's easterly boundary." (Emphasis added.) As the court observed, it was not a "roadway in the ordinary sense—its use was limited to passage by *Beard's* equipment only, and for the location of *Beard's* machinery used for dredging from time to time." (Emphasis added.)

Since the upper ninety feet of the plaintiff's boundary still fronted on the river in 1965, and only the lower or southerly forty feet of that boundary then bordered the roadway built by dredging the river and filling the foreshore, that is, the land under the waters of the river between the high and low-water marks, the trial court found for the defendant Dan Beard, Inc., on its counterclaim but only to that limited extent. That was beyond the allegations of the counterclaim.

The defendant Dan Beard, Inc., had alleged in its counterclaim that by virtue of adverse possession it had acquired *"sole and exclusive title to the premises* [obtained by filling the foreshore between the high and low-water marks] *and corresponding riparian rights therein"* (emphasis added) along the entire easterly boundary of the plaintiff's property. The trial court disallowed that claim in its entirety. Rather, the court found that "[t]he *defendant,* in its counterclaim, has proved only that it has adversely possessed the *plaintiff's riparian rights easterly of the plaintiff's easterly boundary* for a distance of forty feet northerly measured from the southeasterly corner of the plaintiff's premises." (Emphasis added.) No such claim that it adversely possessed the plaintiff's riparian rights was alleged in the counterclaim of the defendant Dan Beard, Inc. The court erred in ruling beyond the claim of the defendant Dan Beard, Inc.

The defendant Daniel Nichols Beard acquired Two Mile Island on February 20, 1941. Some time after-

ward, the dredging of the Housatonic River for sand and gravel began from the island. On July 16, 1946, he received from the War Department authorization to construct two bulkheads of grounded barges filled with gravel. According to his testimony, these bulkheads were placed in the area of property that he then owned on the west shore of the river, adjoining the plaintiff's property on the south. The authorized location does not appear in the record because the approved plan was not attached to the authorization in exhibit. Notwithstanding the War Department's explicit caveat in the headnote of the document that the permit "does not authorize any injury to private property or invasion of private rights," it was Beard's testimony that these barges were placed at what is claimed to be Matto property. The trial court, however, did not make such a finding. Beard's further testimony was that at some time thereafter "B. N. Beard Company and Dan Beard, Inc." filled in the area of the second or northernmost causeway "and in front of Matto's property."

On September 20, 1973, Douglas M. Costle, commissioner of environmental protection, sued to enjoin The Dan Beard Construction Co., Inc., from dredging operations in the river. A further injunction action was brought against the same corporation on November 5, 1973, seeking the removal and dismantling of the two illegally constructed earthen and gravel causeways then connecting Two Mile Island with the Shelton mainland. At some undisclosed date in 1973, Dan Beard, Inc., was incorporated and came into existence. Its corporate relationship to the defendant The Dan Beard Construction Co., Inc., in the two injunction actions is not in evidence or in the record. Judicial notice is taken that on April 22, 1974, the commissioner of environmental protection amended his writ and complaint in each of these two cases to add as defendants Daniel Nichols Beard and Dan Beard, Inc., and to allege further that

"Daniel Nichols Beard claims title to Two Mile Island" and that "Dan Beard, Inc., is engaging in and is carrying on dredging activities at Two Mile Island [only] in the same manner heretofore complained of."

On the basis of this inconclusive evidence of the corporate relationship between B. N. Beard Company, The Dan Beard Construction Co., Inc., and the defendant Dan Beard, Inc., and notwithstanding the burden of proof requirement that adverse possession "is not to be made out by inference, but by clear and positive proof"; *Roche* v. *Fairfield,* supra; the trial court concluded as follows: "While it is true that [Dan Beard, Inc.,] existed only since 1973, *Beard and his brothers and their various corporations have been conducting the dredging operation continuously since the 1930's and therefore there has been the required continuity of time of the dredging and fill operations to complete the process known as tacking."* (Emphasis added.) We find error in this conclusion of the trial court.

The authoritative rule of tacking successive possessions for the acquisition of title after fifteen years is found in *Smith* v. *Chapin,* 31 Conn. 530 (1863). See *Marquis* v. *Drost,* 155 Conn. 327, 332, 231 A.2d 527 (1967). The "continuity of *time* of the dredging and fill operations" does not "complete the process known as tacking," as the trial court erroneously ruled. (Emphasis added.) *Privity of estate* is not necessary, but rather, *privity of possession.* "It is sufficient if there is an adverse possession *continued uninterruptedly* for fifteen years whether by one or more persons. This was settled in *Fanning* v. *Willcox,* 3 Day 258 [1808]. Doubtless the possession must be *connected* and *continuous,* so that the possession of the true owner shall not constructively intervene between them; but such continuity and connection may be effected by any conveyance agreement or understanding which has for its object a transfer of the rights of the possessor, or of his pos-

session, and is accompanied by a transfer of possession in fact."(Emphasis in original.) *Smith* v. *Chapin,* supra, 531–32. Privity of possession is defined as a continuity of actual possession, as between prior and present occupant, the possession of the latter succeeding the possession of the former under deed, grant, or other transfer or by operation of law. *Vance* v. *Wood,* 22 Or. 77, 85, 29 P. 73 (1892), citing *Smith* v. *Chapin,* supra. The successive fillings of gravel and sand in the river foreshore, in undetermined amounts extending an unmeasured distance into the river by B. N. Beard Company, by The Dan Beard Construction Co., Inc., and by Dan Beard, Inc., respectively, does not establish the necessary privity of possession. Such a circumstance only shows a succession of independent actions, one not necessarily supporting the other. 3 Am. Jur. 2d, Adverse Possession, § 87.

The trial court did not specify the plaintiff's riparian rights which it concluded that the defendant Dan Beard, Inc., adversely possessed east of the southerly forty feet of the plaintiff's boundary on the river. The plaintiff, as owner of upland property bounding on navigable waters, has no riparian right to extend his property beyond the high-water mark into the foreshore between the high and low-water marks by the deposit of fill. Since the plaintiff possessed no such riparian right appurtenant to the upland property, the defendant Dan Beard, Inc., could not obtain by adverse possession the right to deposit fill on the foreshore of the river.

"It is settled law in this State that the public, whose representative is the State, is the owner of the soil between high and low-water mark upon navigable water where the tide ebbs and flows. . . . The owner of the adjoining upland has certain exclusive yet qualified rights and privileges in the waters and submerged land adjoining his upland. He has the exclusive privi-

lege of wharfing out and erecting piers over and upon such soil and for these purposes of occupying and using it in any manner which does not interfere with navigation, and he may convey these privileges separately from the adjoining land. He also has the right of accretion and generally of reclamation and the right of access by water to and from his upland. . . . These rights, which are in the nature of a franchise, constitute a species of property and are separable and alienable as thus separated in the same manner as other property. . . . The fundamental riparian right on which all others depend is the right of access. *Orange* v. *Resnick,* 94 Conn. 573, 582, 109 Atl. 864 [1920]. The riparian proprietor's right of access is distinguished from that which individual members of the general public enjoy. . . . The exclusive franchise of reclamation and of wharfing out is merely a mode of exercising the right of access and 'in this State at least no distinction can be drawn between them.' *Orange* v. *Resnick,* supra, p. 582." (Citations omitted.) *State* v. *Knowles-Lombard Co.,* 122 Conn. 263, 265–66, 188 A. 275 (1936). A riparian owner, however, may not "remove the sand from the public beach lying between high and low-water mark and sell it. This is in no respect exercising his right of access but is an act of ownership." Id., 267.

"The foreshore, the land lying between the high and low-water marks of navigable waters, is subject to the rights of several classes of persons. First, there is the *jus publicum:* the right shared by all to navigate upon the waters covering the foreshore at high tide and, at low tide, to have access across the foreshore to the waters for fishing, bathing or any other lawful purpose . . . . Second, there is the *jus privatum:* the right of the owner of the foreshore. . . . When ownership of this land, as is usually the case, is vested in a governmental authority, it is said to hold title in trust for the public good, with the right to control and regulate com-

merce and navigation thereon, as well as fishing or bathing, subject to the *jus publicum* . . . . Third, there are the rights of the riparian owner, the owner of upland fronting on navigable tidal waters. . . . [T]he riparian rights of an upland owner are the rights of reasonable, safe and convenient access to the water for navigation, fishing or similar purposes . . . ." (Citations omitted.) *Arnold's Inn, Inc.* v. *Morgan,* 63 Misc. 2d 279, 283–84, 310 N.Y.S.2d 541, (1970); *Tiffany* v. *Town of Oyster Bay,* 234 N.Y. 15, 20–21, 136 N.E. 224 (1922).

The riparian rights of an upland owner may not be impaired by reason of an illegal fill of the foreshore extending beyond the upland ownership. *Tiffany* v. *Town of Oyster Bay,* supra, 21–22. Where title to the foreshore owned by the state is inalienable, as is the case under consideration, title to the foreshore upon its illegal filling cannot be obtained by adverse possession. *Hinkley* v. *State of New York,* 234 N.Y. 309, 315, 137 N.E. 599 (1922). Similarly, upon such illegal filling of the foreshore owned by the state, the riparian rights of the upland owner cannot be taken by adverse possession of the filled foreshore. See *Tiffany* v. *Town of Oyster Bay,* supra.

In view of the stated law relating to the various rights in the foreshore between the high and low-water marks of navigable waters belonging to the pertinent classes of persons, we conclude that the trial court erred in holding: "The *defendant* acquired the riparian rights of the plaintiff to the portion of the roadway below the high-water mark for a distance of forty feet from the plaintiff's southerly boundary, since it filled the land before 1965 and used it continuously, openly, notoriously, exclusively, adversely to the plaintiff's and his predecessors in title's rights and under a claim of right for an uninterrupted period of fifteen years. The filling of the land and the continuous maintenance of the

fill on the land was sufficient by itself to fulfill the requirements of adverse possession; it constituted a using of the land. In addition thereto the use for dredging the river was open, notorious, exclusive, adverse to the owner's rights, made under a claim of right, and uninterrupted for a period of fifteen years. The fifteen years were continuous from 1965 to July 1980." (Emphasis added.) "The use is not exclusive if the adverse user merely shares dominion over the property with other users. *Short Beach Cottage Owners Improvement Assn.* v. *Stratford,* 154 Conn. 194, 199, 224 A.2d 532 (1966)." *Roche* v. *Fairfield,* supra, 498.

Additional error is found in these conclusions because the use of the foreshore for dredging operations after October 17, 1974, was continued under the authority of the permit of the department of environmental protection issued for retaining and maintaining the two causeways over the foreshore from the west bank of the river to Two Mile Island. "This authorization . . . constitute[d] the Certificate or Permit required by Section 25-7d of the 1972 Revision of the General Statutes."[9]

Furthermore, this permit was issued to the defendant Daniel Nichols Beard, and not to the defendant Dan Beard, Inc. Therefore, no rights of adverse possession could accrue under it to support the corporate defendant's counterclaim. The terms of the state permit also precluded the acquisition of any adverse possession rights. First, the permit stipulated that it "conveys no property rights in real estate or material nor any exclusive privilege, and is further subject to any and all public and private rights." Therefore, the defendant Dan Beard, Inc., cannot assert that it was continuing its dredging and filling operations after October 17, 1974, under a claim of right. Second, the general conditions

---

[9] See footnote 7, supra.

included: "3. That no attempt shall be made by the permittee or the owner to forbid the full and free use by the public of all tidal or navigable waters at or adjacent to the work or structure; that there shall be no unreasonable interference with navigation by the work herein authorized." The terms of this condition prevent the defendant Dan Beard, Inc., from successfully claiming that it adversely possessed the foreshore adjoining the plaintiff's property to the exclusion of all others.

The trial court specifically found that the foreshore adjacent to the southern forty feet of the plaintiff's boundary was filled before 1965, and that the filling of the foreshore adjacent to the remaining ninety feet of the plaintiff's boundary did not begin until 1970, and extended farther and deeper into the river even later. Prior to the issuance of the permit for the causeways to the defendant Daniel Nichols Beard on October 17, 1974, such filling of the foreshore incidental to the dredging of the river was in violation of General Statutes § 25-7d (Revised to 1972),[10] and constituted a public nuisance under General Statutes § 25-7e (Revised to 1972).[11] General Statues §§ 25-7d and 25-7e (Revised to 1972) were first enacted as Public Acts 1963, No. 569, §§ 3 and 4,[12] respectively, effective June 27,

---

[10] See footnote 7, supra.

[11] See footnote 7, supra.

[12] Public Acts 1963, No. 569, § 3, provided: "No person, firm or corporation, public, municipal or private, shall erect any structure, place any obstruction or encroachment or carry out any dredging or other work incidental thereto in the tidal, coastal or navigable waters of the state until such person, firm or corporation has submitted an application and has secured from [the water resources commission] a certificate or permit for such work and has agreed to carry out any conditions necessary to the implementation of such certificate or permit. The commission may adopt, revise and amend regulations and procedures appropriate to carry out the provisions and enforcement of this act in the public interest."

Public Acts 1963, No. 569, § 4, provided: "Any structure, obstruction or encroachment placed in the tidal, coastal or navigable waters of the state or any activity carried out incidental to the construction or maintenance

1963. Additionally, General Statutes (Revised to 1972) § 25-10[13] prohibited the removal of sand and gravel from lands under tidal waters without a state permit issued under § 25-11[14] by the commissioner of environmental protection.

As noted earlier, the commissioner of environmental protection instituted two injunction actions against The Dan Beard Construction Co., Inc., based upon the alleged violations of these statutory requirements. The first sought to enjoin the dredging and sale of illegally removed sand and gravel under General Statutes (Revised to 1972) § 25-11. The second sought to have the two illegally built causeways to Two Mile Island removed and dismantled. These actions were settled by the application of the defendant Daniel Nichols Beard for the necessary permits, which were issued on October 17, 1974, with conditions.

According to the facts found by the trial court, the defendant Daniel Nichols Beard is in violation of his permit for the retention and maintenance of the two causeways to the island. A "causeway" is defined as "a raised road across water or marshy land with the water or marshy land on both sides of the road." *Citizens Committee for the Hudson Valley* v. *Volpe,* 302 F. Sup. 1083, 1089 (S.D.N.Y. 1969). Although the permit provided that the causeways were to be "primarily used as access to the Island," the trial court found instead that the two causeways are used as an integral part of the dredging operation of the defendant Dan Beard, Inc., in the washing and cleaning of the sand and gravel taken from the river.

of such structures or encroachments without a certificate or permit from the commission shall be considered a public nuisance. The attorney general shall, at the request of the commission, institute proceedings to enjoin or abate any such nuisance."

[13] See footnote 6, supra.

[14] See footnote 6, supra.

The application of the defendant Daniel Nichols Beard made on July 11, 1974, to the department of environmental protection for a permit approving "the existence and maintenance of two existing causeways located at Two Mile Island" contained this statement: "14. USE OF CAUSEWAYS: Access to and from Shelton mainland and to and from Two Mile Island." An exhibit attached to Beard's application consisted of a "Plan of Existing Causeways to Two Mile Island on the Housatonic River—Shelton, Connecticut. Application by: Dan Beard Construction Co., Inc., June 28, 1974, Rev. Aug. 1974." This survey showed the two existing causeways, the one to the north or upriver being 100 feet wide and 225 feet long, and the other to the south being 100 feet wide and 250 feet long. In place of the river, there was depicted on the plan submitted for approval a single oval-shaped "Non-Tidal Lagoon." This was situated between the two causeways, north and south, and between the so-called "roadway" below the high-water mark, along the easterly boundary of the property shown as owned then or formerly by A. Bardugone, the plaintiff's predecessor in title, and the west bank of Two Mile Island, east and west. The plan showing the existing causeways and the lagoon was approved by the permit granted on October 17, 1974.

The so-called roadway previously constructed below the high-water mark and adjacent to the plaintiff's property was not expressly or impliedly approved by the department of environmental protection permit for the continuation of the two causeways. Since the roadway constructed below the high-water mark by fill from the river is "bounded by water on only one side [the east], it, in itself, is not a causeway." *Citizens Committee for the Hudson Valley* v. *Volpe,* supra. Nor was approval for the roadway sought by the defendant Daniel Nichols Beard in his application by designation, description or survey.

In its memorandum of decision, the trial court made the following relevant findings: "[T]he 1970 aerial map shows the roadway extending the full length of 130 feet of the Matto easterly boundary. All of the so-called roadway extended easterly from the plaintiff's easterly boundary into the river and was below the high-water mark. The Housatonic River is a tidal river and therefore has high and low-water marks. The 1970 aerial map shows land which projects easterly of the aforementioned roadway to Two Mile Island, an island located in the Housatonic and owned by the *defendants*. In 1975, the roadway continued to exist along the full length of the plaintiff's easterly boundary, as did the causeway extending to Two Mile Island. In 1975 on the island causeway were *two land locked sump ponds,* the second one having been created in 1972 by the defendant company and, as a result of both the roadway and causeway described, the plaintiff's land no longer fronted on the river." (Emphasis added.)

According to the testimony of the defendant Daniel Nichols Beard, the north causeway, which together with the "roadway" borders on the northerly part of the plaintiff's property, was built in 1970. The south causeway had already been built at that time. From his testimony it is evident that since 1970, the river between the causeways, and its west bank below the high-water mark, were, in effect, appropriated by the defendants to their sole private and business use. The two sump ponds between the causeways were created in 1972. That was two years before the application for the state environmental permit for continuation of the two causeways with a single lagoon of nontidal water between them. Water is pumped into the smaller of two sump ponds. "[I]t is a by-pass from the washland, it goes into one pond, and the silt [collects] in that pond, and there is a pipe from that pond to another—to the big pond that—by the time it gets over to the big pond

the water is clear so nothing goes back in the river." From the big pond, the water is recycled into the washland. When the silt that is washed out of the sand and gravel fills the smaller of the sump ponds, the silt is then dredged out of the pond and sold as "filt." Machinery and equipment necessary for the dredging and cleaning operations is located on a causeway and on the roadway constructed below the high-water mark.

The two causeways, the two sump ponds, and the roadway below the high-water mark adjoining the plaintiffs' boundary on the river were made by digging sand and gravel out of the river before the issuance of the permit by the department of environmental protection in 1974 for the continued retention and maintenance of the two causeways. That segment of the river formerly bordering the plaintiff's property, having been enclosed by the two causeways and converted into two sump ponds for the cleaning of sand and gravel dredged from the river, became an integral part of the sand and gravel operations of the defendant Dan Beard, Inc. All of this exceeded the expressed purpose and violated the scope of the state permit issued for retention of the causeways to provide "access to and from Shelton mainland and to and from Two Mile Island."

We find the trial court erred in holding that the defendant Dan Beard, Inc., has proved under its counterclaim by clear and positive proof that it has adversely possessed the plaintiff's riparian rights to the foreshore easterly of the southern forty feet of the plaintiffs' boundary on the Housatonic River by the illegal filling of the foreshore in its sand and gravel dredging operations.

## II

In his prayer for relief, the plaintiff sought: (1) damages; (2) an injunction that the *defendant* cease and desist from its dredging operation insofar as it

removes fill and gravel from the plaintiff's property and that it not trespass on plaintiff's real estate; (3) an injunction that the *defendant* cease and desist from the removal of plaintiff's boundary markers; and (4) a declaratory judgment as to who owns the land now presently abutting the original easterly portion of plaintiff's land.

The trial court denied the plaintiff's claim for monetary damages for trespass and invasion of his property on this basis: "The plaintiff's claim for fill removed from the southeasterly portion of the premises must be denied since the court has no evidence on which to base a finding of the amount of fill taken, *although fill was taken* . . . . [Therefore] no basis exists upon which to base a finding of money damages." (Emphasis added.) We do not agree with the court's conclusion.

Some damage necessarily follows any wrongful invasion of another's property. This necessary damage is actual, as distinguished from the mere nominal damages involved in some casual and inoffensive tort; but it is nominal as distinguished from any specific damage suffered and proved. In a case like this, some damage results from the mere invasion of the plaintiff's property rights, and its amount, not being determinable by proof, must be comparatively small and in that sense nominal. *Kelly* v. *Ivler,* 187 Conn. 31, 45–46, 450 A.2d 817 (1982). As a general rule, however, this court will not reverse and grant a new trial for the mere failure to award nominal damages. *Rubin* v. *Rios,* 186 Conn. 754, 756, 443 A.2d 1273 (1982); *Leabo* v. *Leninski,* 2 Conn. App. 715, 725, 484 A.2d 239 (1984).

As to the plaintiff's further claims for monetary damages and for injunctive relief, the court briefly concluded: "The plaintiff's claims of title must be denied by reason of his failure to exercise his rights under

§ 52-575[15] and therefore he is not entitled to an injunction, or his claim for money damages, claimed to be measured by the cost of removing the fill in the river, easterly of his easterly boundary."

The trial court erred in this summary denial of injunctive relief on the grounds stated. The first injunction sought to enjoin the "dredging operation insofar as it removes fill and gravel from *plaintiff's property* and [from] trespass[ing] on *plaintiff's real estate."* (Emphasis added.) The court having previously found that "[t]he plaintiff has demonstrated by the preponderance of the evidence that the defendant's dredging operations have eroded and undermined a portion of the plaintiff's premises at the southeasterly corner," it should have considered the plaintiff's further allegations that the dredging activities of the defendant Dan Beard, Inc., have caused, and continue to cause, irreparable harm for which no adequate remedy at law exists.

We reach the same conclusion with respect to the injunction sought to enjoin the defendant "from the removal of plaintiff's boundary markers." The court had previously made these express relevant findings: "In December 1979 or January 1980, the plaintiff had the premises surveyed and in 1980 the engineer set out stakes on the boundary lines of the premises. The defendant's trucks ran over the stakes and they subsequently disappeared." It is a criminal offense to destroy or remove boundary markers placed by a surveyor.[16]

---

[15] See footnote 3, supra.

[16] General Statutes § 47-34a provides: "Any person who knowingly injures, destroys, disturbs or removes any marker properly placed on any tract of land by a surveyor, or by any person at the direction of a surveyor, for the purpose of designating any point, course or line in the boundary of such tract of land, shall be fined not more than fifty dollars."

## III

The final claim on appeal is that the court erred in concluding that the state is a necessary party to the action. The plaintiff had sought "[a] declaratory judgment as to who owns the land presently abutting the original easterly portion of plaintiff's land." After having concluded that the defendant Dan Beard, Inc., had proved its counterclaim that it had adversely possessed the plaintiff's riparian rights to the foreshore easterly of the southern forty feet of the plaintiff's boundary on the Housatonic River by the filling of the foreshore belonging to the state, the court ruled: "The plaintiff's claim for a declaratory judgment is denied for failure to include all affected parties, particularly the State of Connecticut, the owner of the land, over which riparian rights are claimed." We find error in this holding.

While the presence of the state in this action might have been expedient in view of our conclusions respecting the misuse of the causeway permit issued by the department of environmental protection, its joinder at this time and proceeding was not necessary for an adjudication of title to the filled-in foreshore. Moreover, notwithstanding its final denial of the plaintiff's claim for a declaratory judgment, the court in its memorandum of decision had earlier made such judgment when it concluded: "The land filled by the defendant below the high-water mark and easterly of the plaintiff's easterly boundary line belongs to the State of Connecticut . . . . Neither the plaintiff nor the *defendant* can claim title to this parcel of land in the river to the east [of] the plaintiff's easterly boundary." (Emphasis added.)

In view of our conclusions, we need not consider the defendants' alternate grounds for affirming the judgment of the trial court.

There is error, the judgment is set aside and the case is remanded with direction to render judgment for the plaintiff on the counterclaim of the defendant Dan Beard, Inc., and a new trial is ordered solely upon the issue of the plaintiff's entitlement to injunctive relief.

In this opinion the other judges concurred.